## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE:  ALEXANDER E. JONES | § | |
| | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor. | § | Chapter 7 |

---

### CORRECTED[1]
### ALEXANDER E. JONES RESPONSE AND OBJECTION TO THE TRUSTEE'S EXPEDITED MOTION FOR ENTRY OF AN ORDER IN FURTHERANCE OF THE SALE OF ASSETS OF FREE SPEECH SYSTEMS, LLC
### [Dkt #915]

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

ALEXANDER E. JONES files this Corrected Response and Objection to the Trustee's Expedited Motion for Entry of an Oder in Furtherance of the Sale of Assets of Free Speech Systems, LLC ("FSS") [incorporating herein the facts, conclusions and arguments in the set out in Adversary No.  24-03238] and would show as follows:

### I
### PRELIMINARY STATEMENT

1.      The Trustee offered for sale the going concern assets of Free Speech Systems, LLC ("FSS") that currently (through November 13, 2024) was grossing approximately $5M to $7M+ a month, netting approximately 15%-20% (up to $5M to $10M annually after tax and costs of operations) [*See*, Judicial Notice Trustee's operating reports filed and FSS Monthly Operating Reports filed in the FSS Chapter 11 case] which earnings would be available for payment of

---

[1]      Alex Jones counsel filed this objection while attending two days of deposition discovery and remotely, resulting in filing an earlier incomplete version of the objections Alex Jones desired make.  This error was discovered late Saturday and has been corrected and has been further updated with certain testimony of the Trustee and the Auctioneer to correct several misconceptions in their conduct, testimony that did not end until after 5:00 PM of the filing deadline last Friday.

Connecticut and Texas judgment claims, *if they are ever liquidated by law or by agreement*. [2]

2.     To accomplish this sale the Trustee initiated what may have been originally intended by the Trustee to be ordinary, cash-bid auction on non-complex terms of a bankruptcy proceeding.   Soon, however, this §363 Asset Sale procedure turned into a complex, highly objectional, unusually non-transparent, process designed for the Trustee to accomplishing the will of the Connecticut Plaintiffs and the Joint Bidders.   By the Connecticut Plaintiffs participation as a Joint Bidder, the Joint Bidders seek to monetize their stayed, non-final $1.45 billion Judgment *long before their "stayed" Judgment is final on appeal.* [3]   And, the acquisition is not any legitimate business purpose, but for the purpose and design to "punish"[4] Alex Jones by the acquisition of the

---

[2]     Alex Jones has interposed a number of objections to the sale of certain specific property and to the sale process itself and the participation of parties whose motives are not consistent with bankruptcy sales, among other objections.  Alex Jones has also objected to the recognition of the stayed and non-final Connecticut Judgment now on appeal for any purposes as a cash equivalent or as a value qualifying for any use in violation of the stay.

[3]     *Henry v. First Nat'l Bank*, 595 F.2d 291, 200 (5th Cir. 1979):
>  In the ordinary case a state court judgment must have been approved by the highest court of the state before it becomes immediately enforceable. *See New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948).

As this Court has only recently has been made aware, a Connecticut Statute automatically stays civil judgments through the first full round of appeal, just as referenced by the Supreme Court in *Henry*:
> "Connecticut Practice Book – Rules of Court:
> "Sec. 61-11. Stay of Execution in Noncriminal Cases (a) Automatic stay of execution Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to [take] file an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. If the case goes to judgment on appeal, any stay thereafter shall be in accordance with Section 71-6 (motions for reconsideration), Section 84-3 (petitions for certification by the Connecticut supreme court), and Section 71-7 (petitions for certiorari by the United States supreme court)."

*State v. Charlotte Hungerford Hosp*., 308 Conn. 140, 146, 60 A.3d 946, 950 (2013). <u>While Stayed, Collateral Estoppel Is Not Applicable</u>:  A party must receive one opportunity for appellate review before it will be subject to the application of collateral estoppel. *citing Commissioner of Motor Vehicles v. DeMilo & Co*., supra, 233 Conn. 268.

     This Court was told in writing in the Connecticut Plaintiffs Opposition to Jones's (sic) Claim Objection [Jones Exhibit 13] that because Jones had not obtained a stay, collateral estoppel could properly be applied.  Id. at ¶17.  The Connecticut Judgment has always been stayed automatically by Sec. 61-11 Connecticut statute.  The representation and argument was bogus when made and remains so.

[4]     The announced motives of this Joint Bidders' non-cash scheme was to <u>***destroying the "going concern"***</u> of FSS so that the owner and debtor Jones could never repay the Judgment – that is, *to buy and shut down*, and liquidate all activities but keep the customer lists for harassment and "InfoWars" brand and IP for purposes of future attacks on the debtor Jones and public confusion of product-purchasers and listeners.  *See infra*, Figure 1 and 2, pgs. 10 and 11.

"InfoWars" name and brand, together with all of its non-assignable, non-transferrable customers/listeners data and IP Content access long before their "stayed" Judgment is final on appeal, *for the express purpose of destruction of both*.   In this process the Trustee, for instances, testified that he was presented with a written demand and agreement from the Connecticut Plaintiffs that they have a veto power over the determination of a successful bidder.[5]  The Trustee testified that he refused this demand, however, the resulting bid process actually employed by the Trustee reflects an unjust and unfair biased approach to an asset sale in that it *guaranteed that the Joint Bidders would be the winning bidder*.

3.     The Joint Bidders developed a scheme, unknown to any bidders other than the Connecticut Bidders and their joint partner Global Tetrahedron (collectively the "Joint Bidders"), and ultimately the Trustee, by which the Trustee would accept a "topping" or "floating" bid in any offer [*See*, Jones Exhibit 8] even though such acceptance violated the bid instructions of no "formulas" or "contingencies" [*See*, Jones Exhibit 6, ¶2, last sentence] and made a mockery of a fair and transparent auction and bidding process.   This was the position of the Joint Bidders Final bid, in the  Trustee's proposed Final Order Approving the Sale and Asset Purchase Agreement furnished this Court on November 19, 2024

4.     Explained in detail below, there were specific provisions of this Courts Sale Order requiring an Auction, or if changes to the Auction protocol and procedures were to be made by the Trustee (*e.g. cancelling an auction at all*) the Trustee must make an "*announcement on the record at the auction*" of any proposed changes.  This was not done.  In fact, the Trustee greatly overuses the answer as to why things were done inconsistent with this Court's Sale Order and his own IP

---

[5]       The Trustee testified that this demand was in a written form that he was requested to sign, but did not have a copy.  A request was made of the Trustee's counsel to produce the report, and the indication was that it would be produced.  The Connecticut Plaintiffs have publicly announced that acquiring joint control of the FSS assets was for the purpose of using those assets, in their words, to "punish" Alex Jones.

Asset Bid Instructions, claiming his "sole discretion" to make any changes he deemed reasonable.[6]

5.      Instead, after the initial bids were solicited *and received*, and the Trustee knew the demands of the Joint Bidder to be guaranteed the winner, the Trustee capitulated and changed the protocol by canceling the Auction and putting in place a purported single chance to make a "highest and best bid".  The "accepted" the two initial qualified bids made:

a.      The FUAC's cash bid of $1.2 million (anticipating an auction process to a final bid); and

b.      The Joint Bid which was for $1 million cash, and a formula that was to be applied *starting with the competitor's highest bid* and applying the Connecticut Plaintiffs' claim of a dividend waiver of their share[7] of possible future estate dividends from this sale proceeds, in an amount sufficient to provide for a dividend to all other creditors equivalent to what they would have received under the competitor's bid, plus $1.00.[8]  Under this formula, and under no circumstance,[9] was the cash to increase over the $1 million bid and of course, with this topping bid the Joint Bidders were guaranteed to always be over the amount of the competitor FUAC *by $1.00.*[10]

---

[6]      *In re Bohannan,* No. 07-32050 (LMW), 2009 Bankr. LEXIS 950, at *13 (Bankr. D. Conn. Jan. 6, 2009) dealt with a § 363 sale and the need to protect the interest of all parties from the indiscretions of the Trustee:
When the fiduciary's "methodologies and procedures are restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted . . . , then inquiry into . . . [the fiduciary's acts] is not shielded by the business judgment rule." *Resolution Trust Co. v. Rahn,* 854 F.Supp. 480, 489 (W.D. Mich. 1994).

[7]      Creditors without an allowed claim have no share of dividends.  A creditor whose claim has only been filed and presumed allowed, and show claim is judicially determined to be zero, have no share of dividends.

[8]      This formula bid could only be calculated or known by applying the waiver amount needed to meet, then beat by $1.00, the competitor FUAC's bid – in other words, a topping bid right not given to any other bidder and bid consideration based on a non-final judgment of unknown final value.

[9]      Circumstances, such as the Connecticut Judgment is reversed on appeal, in which event the other creditors would not share in the rejected $1.2 million (or later the $3.5 million final bid by FUAC), but the $1 million bid by the Joint Bidders (or later the $1.75 M final bid by the Joint Bidders.

[10]      The $1.00 over bid reflects the arrogance of the

Remarkably, the Trustee "accepted" *both bids*, then without explanation the FUAC, cancelled the expected on-line Auction, and initiated a totally new bidding protocol that provided only a single additional round of "*best and final offers*" to be received, "*… provided these offers did not include or rely on "formulas" or "contingencies.*" Of course, any right to make a "topping bid" was never disclosed to FUAC.   In fact, all that FUAC knew about the expected bidding requirements (which were in writing, *See* Jones Exhibit 6) said nothing about floating or topping bids that required a formula and used contingencies to be determined *that had already been accepted by the Trustee*.

6.    In the second round of bidding the Trustee received two the same two additional *purported* "best and final offers" from both bidders:

(i)    The FUAC's cash bid of $1.2 million *was increased to $3.5 million* [*See, Jones* Exhibit 7];

(ii)    The Joint Bid cash bid of 1 million was increased by $750,000, to $1.75 million (coincidentally, *one-half the amount* of the FUAC's bid) and as anticipated, included a topping or floating bid based on not $1.00 over the FUCA bid *but $100,000.00 over the FUCA's bid* (and again, *without any additional cash going to the estate*), but capped at $7 million amount of any waiver**[11]** (again, coincidentally, *exactly twice the amount* of the FUCA final and best offer.  [*See*, Jones Exhibit 8].

7.    Thus, the Joint Bidder with its topping component, would be able to acquire the business no matter the amount of the other (and actual) "highest and best offer" bid. The Connecticut Plaintiffs did not now need veto power over the winning bidder – they were the guaranteed winning bidder.

---

[11]    Although it is clear that the best and final Joint Bid was to be capped at $7 million or less, calculated to only over bid the

8.      But the scheme and manipulation of this Court Sale Order does not end here.  As this Court is aware, within only hours before the winning bid being announced on the morning of November 14, 2024 (even though the amount of the winning bid *was not being disclosed*) the Trustee traveled to Austin and directed that not only the Alex Jones Show go dark, but that all operations, sales, and activities cease.  It is unclear how many of the 30 employees believed they were being fired.  Sales were ceased and the website not only taken down, but somehow inquires seeking "InfoWars.com" were re-directed to the Global Tetrahedron new web page touting their purchase and explaining their intended use of the site to promote gun control, through various means including parody sent directly to the FSS and Alex Jones purchasers through access to their purchase information the Trustee is selling, *even though the "Terms of Use" prohibited any sale or transfer of the customer information*.  When asked if the Trustee's agent Auctioneer purported to sell all IP (FSS and Jones) in face of the terms of use prohibiting sale or transfer, he agreed that it had been sold and simply said it's the buyer's problem (i.e., let the courts sort it out).

9.      FUCA as the successful *backup* bidder, and later Alex Jones, both complained, in person and in writing, resulting in a status hearing after the sale and a hearing on Monday November 18, 2024.   By this date a Motion to disqualify the winning bidder was filed by the approved backup bidder, and an Adversary Proceeding seeking injunctive relief from the purported sale was likewise filed.

10.     Also on November 18, 2024, the Trustee filed his Motion for approval of the Sale ("Motion to Approve the Sale) reciting in the proposed order submitted to the Court that the winning bid was $1.75 million in *cash and receipt of a dividend waiver sufficient to create a $100,000.00 overbid dividend to the other unsecured creditors*, calculated under its bid formula – precisely that which the Trustee prohibited in its IP Assets Auction Bid Instructions.  In other words, the winning bid (which this Court questioned at the original status hearing *why the backup*

*bidder had not been told the amount of the winning bid*?) was disclosed both as written in the actual Joint Bid as a $100,000 over bid plus the cash payment but referenced as a $7 million bid based on the first page of the Joint Bidders' Bid.  That was the extent of the due diligence done to reasonably and fairly value a stayed, non-final judgment's right to a future dividend that *if reversed on appeal* would have a value of zero to the estate and remaining creditors.  And, when that zero value became known, the only cash to share by the remaining creditors is the $1.75 million – not the FUAC's $3.5 million.    The gross lack of due diligence and reasonable business judgment in such eventuality costs the estate and creditors $1.75 million, and of all things, the Connecticut Plaintiffs have property, including a revenue stream, for which they paid nothing.  And, Alex Jones and FSS have lost all of their respective assets and value, because the Connecticut Plaintiffs are acquiring these assets to destroy or devalue as a political statement.

11.    Up to this point there was no disclosure by the Trustee that the Joint Bid had an internal inconsistency in referencing the $7 million cap in the written offer and "***not less than***" $7 million on the added note at the bottom on the Joint Bidders bid form (even though that reference is to the written offer attached by the Joint Bid referencing "***not more than***" $7 million and several pages and a Chart illustrating how the bid amount is calculated not to exceed $7 million.

12.    In fact, not until December 5, 2024, at the deposition of the Trustee was it disclosed that the Trustee now claims that upon observing the internal inconsistencies of the Joint Bid form and the attached Written Bid, the Trustee made the unilateral decision that the highest and best bid was for $7 million (instead of "not less than $7milion).

13.    As a result of the Trustee's deposition, it appears that the Trustee now claims that this it was his intent in accepting the winning bid at $7 million dividend waiver, but the Trustee was unclear when he first noted the inconsistencies;  that he never discussed the inconsistencies with the Joint Bidders and never told anyone (other than possibly his lawyers) of this unilateral

decision.   The Trustee permitted pleading to be filed reciting the floating bid based on the $100,000.00 over the FUAC bid, including that recitation in the order filed along with the Trustee's Motion to Approve the Sale [Dkt #915].

14.     Of course, the final Joint Bid contained the prohibited no formula-no contingencies requirement needed to know the amount of the bid, and the contingencies of their bid that was dependent on the amount of the FUAC highest and best bid.  The right to make a floating or topping bid *in a single bid auction* guarantees a win, unless as in this case the "cap" is exceeded.  Likewise, an undisclosed right to a topping bid can never be considered the "highest and best offer" because no one knows what the *topping bidder might have bid* if compelled to a one-time bid of a best fixed bid (as was required by the IP Assets Bid Procedures).  And this Court cannot know the Joint Bidders' highest and best offer because the Joint Bidders were given the privilege of bidding on the basis of what FUAC's *actual* "highest and best offer" was.  FUAC was not given that privilege, nor even told that the other bidder was given that privilege.

15.     The unfairness of this process is made more complicated by the Trustee's agent and Auctioneer, who takes the explanation one step further.  The Auctioneer testified that he called the Joint Bidders November 11, 2024, and told them no formulas or contingencies would be considered by the Trustee and that the Joint Bidders must state a specific bid amount without the bid being contingent on the amount of the FUAC bid.  When the bids were received according to the Auctioneer, the specific bid amount he determined to use was $7 million, even though it contained an asterisk to a note that each $7 million reference was a "*not less than* $7 million" … as set forth in more detail in the accompanying Final Bid Letter" (which provided for the $100,000 topping bid found in the Trustee's original Motion to Approve the sale).   So much for following the "verbal" demands of the Auctioneer.  Next, the testified that he simply ignored the "not more than" "not less than" language, but the Auctioneer is correct that by ignoring the Joint Bid

attachments, the winning bid is a $7 million dollar waiver.   But the bid is "not less than $7 million according to the Auctioneer, so how much money did the Auctioneer and Trustee leave on the table?   The facts and truth are that no one knows what bid amount was actually appropriately accepted, or what the "highest and best bid" might have been.   It is clear that the Trustee intended only to be certain that the Connecticut Plaintiffs as members of the Joint Bidders, won the bid.

> When the fiduciary's "methodologies and procedures are restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted . . . , then inquiry into . . . [the fiduciary's acts] is not shielded by the business judgment rule." *Resolution Trust Co. v. Rahn,* 854 F.Supp. 480, 489 (W.D. Mich. 1994). Moreover, "[t]rustees, like executors and administrators, must use reasonable diligence in the discharge of their duty to 'collect and reduce to money the property of the estates for which they are trustees'." 6 Alan N. Resnick and Henry J. Sommer, *Collier on Bankruptcy* P 704.04[1], at 704-14 (15th ed. rev. 2005). Cf. 11 U.S.C. § 704(a)(1).

*In re Bohannan,* No. 07-32050 (LMW), 2009 Bankr. LEXIS 950, at *13 (Bankr. D. Conn. Jan. 6, 2009).

16.    Jones believes that the obvious intrinsic unfairness of a process advertised as a "final highest and best offer" without "formulas" or "contingencies" raised by the written demands of FUAC and Alex Jones caused the Trustee to realize the error of his decision, so the Trustee disclaimed the accuracy of his own pleadings and opted for a new position that he accepted a fix sum which the Trustee hoped cured the topping bid criticism.   However, even according to the Trustee, the bid of the Joint Bidders was not $7 million, but *not less than $7 million* so, not even the Trustee cannot say how much the Joint Bidders' "highest and best" offer may be, only the *bottom number of their highest and best offer* (*i.e.* "not less than $7 million dollars).

17.    The Trustee should intuit that the Connecticut Plaintiffs would not have bid the fair market value of the going concern of FSS since what they wanted was to buy and destroy.   But his due diligence would have disclosed that his acceptance allowed a "risk free" acquisition of all of FSS and Alex Jones assets, for no cash but through credits on a non-final judgment that, if reversed

on appeal, still left the Connecticut Plaintiffs with the cost-free income from their side-deal with their partner Global Tetrahedron, while Alex Jones and FSS have irreversibly lost everything.   That is the Plan and this Court's catch 22 – all as a result of the Trustee's desire to appease the Joint Bidders through this complex maze of deals without any reasonable basis based on real and verifiable due diligence.

## II.
## JONES "STANDING" TO
## INTERPOSE OBJECTIONS TO THE SALE

18.     Jones has standing to object to the claims involving the sale of his disputed IP Property or Persona rights and property interests (including all "jointly owned" with FSS Intellectual Property).   The Trustee sought and received bids to purchase not only a list of "Disputed Domain Names" which the court prohibited to be sold [*e.g.*, Lot 4 made a part of the Trustee's bid package] but jointly owned IP not subject to involuntary transfer.   This is (i) a direct violation of this Court's caution and requirement, and (ii) a direct injury to Alex Jones property rights as well as (iii) an indisputable fact that Alex Jones is *"potentially concerned with, or affected by, a proceeding."   See, Truck Insurance Exchange v. Kaiser Gypsum Company, Inc., 602 U.S. 268, 269 (2024).   See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a "party in interest's" right to participate].

19.     As part of the Connecticut Plaintiffs manipulating by the Joint Bidding, the Connecticut Plaintiffs published threats to all prospective bidders, that if any third party acquired the InfoWars IP. Assets and employed Alex Jones, the Connecticut Plaintiffs would *"go after ... any (such) new Infowars owner acting as a vehicle for Jones's (sic) continued control of the business*."  [*See, below* Figure 1].



Figure 1

Any *legitimate purchaser* of the InfoWars-FSS assets that would be interested in the going concern value by the participation of Alex Jones.  Not so for the Plaintiffs – their announced intent is to destroy the InfoWars brand and FSS business.



Figure 2[12]

The Sandy Hook tragedy has not been a topic of Alex Jones broadcasts and opinions for many, many years.  However, the public pronouncements maintained by the Connecticut Plaintiffs is that Alex must be removed from the air ways to, according to the Connecticut Plaintiffs' counsel, as a public service and censor him to prevent further harm.   In other words, meaningfully hinder Jones ability to exercise freedom of the press and his right of free speech on all topics, not just the Connecticut Plaintiffs Sandy Hook injuries they claim.  It is now what the Connecticut Plaintiffs believe is currently politically incorrect that must be censured.  Of course, "the business" of Alex

---

[12]    https://www.youtube.com/watch?v=GmDNz7irGgw - November 14, 2024 regarding the assistance in purchasing the Jones assets to shut them down.

Jones as an acknowledged "media figure" is almost indistinguishable from "InfoWars" which was built together, and such co-interest represents Jones' first amendment right through InfoWars to exercise his "freedom of the press" and the corollary right to free speech. The intent of the Connecticut Plaintiffs has nothing to do with economics of this purchase, but is entirely political, designed to remove Alex Jones from any ability to practice his constitutional rights as a media figure. Accordingly, Jones is *justifiably "… concerned with, or affected by, (this) proceeding*.

20.     The Connecticut Plaintiffs know that they are stayed from enforcing the judgment by execution on Jones or FSS assets. Connecticut Plaintiffs scheme however, seek to purchase the FFS and Jones property at a bankruptcy code § 363 sale, instead of seeking an execution sale on its Judgment (which the laws of Connecticut prohibit until the stayed judgment is final). Upon the § 363 purchase, the Connecticut Plaintiffs (as individual buyers in partnership with Global Tetrahedron) may claim to not be bound under the Texas law regarding a premature execution on a judgement, where the judgment is later reversed on appeal. Under Texas law the buyers have liability for the return of the assets taken and the value of those assets, particularly where an operating company was taken and sold.[13] The Joint Bidders, including each individual member of the Connecticut Plaintiffs, are expressly threatening and promising the destruction of the Jones' property and property rights in both FSS and those jointly-owned assets (comprised of many of the FSS owned assets) without assurances that upon reversal of the Connecticut Judgment, Jones has a right to recover his property and property rights, or if sold or destroyed, has an individual claim against the Connecticut Plaintiffs for the value of such property wrongfully taken. Accordingly, Jones is *justifiably "… concerned with, or affected by, (this) proceeding."*

---

[13]     In Texas, a person is entitled to recover his property that has been seized through execution of a writ issued by a court if the judgment on which the execution is issued is later reversed or set aside, unless the property has been sold at an execution sale. Tex. Civ. Prac. & Rem. Code Ann. § 34.021 (1986). If the property has been sold, a person who would otherwise be entitled to recover the property is *entitled to recover from the judgment creditor the market value of the property sold at the time of the sale.* § 34.022.

21.     Jones statutory and constitutional rights are wholly inconsistent with the demands and intentions of the Connecticut Plaintiffs to enforce a political ideology through a bankruptcy proceeding and accordingly, Alex Jones has standing to object to the proposed sale and sale terms.

### III.
### TRUSTEE'S VIOLATION OF THE COURT'S INSTRUCTIONS AND THE TRUSTEES' OWN BID INSTRUCTIONS

22.     Jones incorporated herein the statements and arguments referenced in §§ 1 through 15 above as if set out herein verbatim.

**A.      Unfair and Improper Modification of the Auction Process"**

23.     The Trustee received the two "initial bids" and thereafter, without following the instructions for changes in the Auction process (only made by announcement on the record of the changes) determined to initiate a "best and final" non-auction protocol.  The Trustee had already received the $1 million bid with a toping term that the bidder would pay $1 more than any higher bid made by the other bidder and accepted that bid.   Incredibly, with the knowledge of the Trustee, the new Bidding terms included a provision that instructed the bidders to *avoid submitting a bid that contained "references to any formulas or "contingencies"* (even though the Trustee had already accepted a bid that contained "formulas or other contingencies"). [Exhibit 6 Trustee's IP Assets Auction Bid Instructions 11-11-2024.].

24.     The bid accepted violated the Bid Procedures and unfairly discriminated against FUAC to award the bid to the Joint Bidders.

**B.      The Trustee *Changes the Terms* of the Announced Winning Bidder's Bid When Sued by FUAC and Jones**

25.     It was discovered at the deposition of the Trustee that after he accepted the final offer, and announced the successful bidder, at some point the Trustee's agents entered into negotiations to modify the Joint Bidders' bid from the $100.000 topping bid to a fixed amount of

"not less than $7M" (an oxymoron in and of itself).  These negotiations appear to have begun when Jones and FUAC first complained of the discovered "topping bid" allowed.

26.    To date, no one knows the precise terms of the proposed sale, or how the value or terms are calculated.  No written agreement has yet to be presented.  Likewise, there is no written agreement or understanding of the auctioneer's fees or how those fees will be calculated, a critical component where only $1.75 million is involved and is reduced by those Auction fees.

27.    Jones noticed on November 27, 2024, the deposition of the Joint Bidder Global Tetrahedron ("GT") and for documents to be the following week.  GT refused to participate in any discovery alleging that the Court had not authorized that discovery. To date Alex Jones does not know the current details of discussions and agreements between GT and the Trustee, secrets that cannot be protected by a claim of privilege, the Trustee has asserted.

28.    As of the Trustee's deposition, no modified written APA agreement was produced so no one but the Trustee and Joint Bidders know what *may* have been discussed, and neither is talking.  The Joint Bidders and the Trustee claimed at the Trustee's deposition a "common interest" privilege so as to refuse to disclose the contents of their claimed common-interest privileged communications.   So much for transparency by a fiduciary.   The interests of all parties are a concern, not just FUAC and Alex Jones, but the remaining creditors, the individual members of the public being treated as a "transferrable commodity" and the bankruptcy system itself, all are paramount when a § 363 sale is contemplated:

> In appropriate circumstances it is proper for a court to interfere with the trustee's judgment "for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders." *In re Blue Coal Corp.*, 59 B.R. 157, 163 (Bankr.M.D.Pa.1986); *see also G—K Dev. Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.*), 994 F.2d 744, 745 (10th Cir.1993) (approving the sale to an alternate bidder that was not recommended by the trustee).

*In re Royal Coachman Mobile Home Park, LLC,* No. 16-03109-FPC11, 2021 Bankr. LEXIS 119,

at *11 (Bankr. E.D. Wash. Jan. 20, 2021).

      **C.**    **The Trustee Ignored This Court's Instructions to Not Sell Disputed Jones IP**

29.    To begin the bidding process, in part the Trustee produced and circulated a "bid form" for bidders that contained a schedule designated as "Lot 4" "Contested Domains" assets, consisting of the Jones protected and disputed Intellectual Property.   Both bid forms were filled-in with bids for Lot 4 to purchase and acquire the disputed Lot 4. [*See*, Trustee's Motion for Order in Furtherance of Sale, Ex. A, pg. Dkt # 915-1 pg. 74-75].  Of course, this is precisely what this Court instructed the parties not to be done.

30.    After the Trustee's auction, Jones discovered through the bid documents produced, that the Trustee accepted cash bid *from both bidders* on Lot 4.  Jones objected to this violation of the Courts instructions on November 15th and on November 18, 2024, filed an Adversary Proceeding objecting to this sale.  Upon objections raised by Alex Jones and FUAC about this sale of the contested Domain Names,  for the first time, *the Trustee changed the title to the Lot 4* contested Domain Names to "***Excluded Domain Names***" [*See,* Exhibit 10, Schedule 1.1.(b)(xi) attached to Trustee's proposed APA].   It is not clear whether both, or either bidder, agreed that they will waive their bid, and the amount dedicated for purchase of Lot 4, and it appears the Trustee has not even sought an agreement by the winning bidder to forego the Joint Bidders claim to Lot 4 that their bid covers.

31.    Additionally, the bid packages and all sale data details were restricted to the data room and were not furnished to the Debtor.  The Debtor was told that the Jones disputed IP would not be sold, and did not investigate to determine if that was a true representation.  Clearly it was either mistakenly sold, or intentionally sold and although Jones does not have adequate information to know which is true, what is true is that Lot 4 was published and bid on by both bidders, but now is marked "Excluded."  I the winning bidder (who would not cooperate in

expedited discovery) claims ownership, this is another objection that Jones makes.

## IV.
## ENCUMBRANCE OR LIEN OBSTICLES TO THE SALE

30.     Jones incorporated herein the statements and arguments referenced in §§ 1 through 15 above as if set out herein verbatim.   It is the general rule and practice that if property is to be sold free and clear of liens, there should be a showing of likely equity in the collateral.   At this stage, the collateral of FSS has an accepted bid of $1.75 million, while outstanding liens exceed $90 million among two creditors with liens or encumbrances.  The Trustee has not dealt with the two encumbrances against a significant portion of the assets, including the existing lien in favor of PQPR (which on a going concern should have value), and an existing non-appealed turnover order in favor of the Texas Plaintiffs covering all of the FSS assets (of course itself likely subject to the PQPR perfected liens).  This Court's sale order has been appealed by the Texas Plaintiffs as holders of the turnover order.

32.     Although the sale purports to be free of all liens, claims and encumbrances, the amount of these encumbrances exceed an estimated $98,000,000.00 and neither has been resolved so that neither of the creditors, nor this Court, has any idea whether this sale will generate funds *for any creditor distributions at all*.   And the Trustee has not indicated that it has done its due diligence and represents that this entire process will benefit the unsecured creditors.  This is not to say that some arrangements are usually in place, but as of now there is no evidence of the treatment and handling of these encumbrances.

33.     Next is the Texas Business Organization Code governing the acts and conduct of a Texas limited liability company.  Even were FSS in a Chapter 7 case, and in particular now that it is not, the TBOC must be complied with to assure any sale of the assets of FSS could or would pass clear title.  The Chapter 7 estate holds an undetermined interest in the assets of FSS, including

the assets made the basis of the appealed order of this Court authorizing the sale.

34.     Although the Trustee may have Texas Business Organization Code ("TBOC") may have rights as an assignee at law, the status of those rights has not been determined and are certainly subject to debate and conflicting decisions of bankruptcy and appellate courts.  It does not appear to be disputed that the Trustee has no rights in the individual assets of FSS, which recognizes the settled law that owners of a Texas limited liability company have no rights in the LLC's assets based on their LLC ownership membership.

35.     The same rule applies with respect to Alex Jones as the *sole owner* of FSS – Jones does not as an owner have rights in the FSS Assets.

36.     Alex Jones is, however, the sole manager of FSS and has not consented, nor has he been asked to consent, to the sale of all or substantially all of the FSS assets.

37.     Alex Jones further has rights, as at least a joint copyright owner, in all programming, and he has a co-interest at least in intellectual property acquired by the joint efforts of FSS and Alex Jones, which such joint ownership has not bee determined.   As an example, the "brand" Infowars was jointly built by the assets and efforts jointly by FSS and Alex Jones, and co-ownership of such IP that is so tied to Alex Jones persona, is a protected personal right of Alex Jones.

38.     **<u>Importantly</u>**, each of these issues, or all of these issues, have been resolved between Jones and FUAC bidder, through Jones commitment to continue to be employed and continue to work and develop the co-interest in all FSS property purchased by FUAC, but have not been pursued or resolved by the Trustee.  The Trustee's due diligence includes knowledge of the expected employment of Alex Jones with the backup bidder, and the resolution of all TBOC rules and regulations, and ongoing negotiations to resolve the PQPR and the Texas Plaintiffs if FUAC is the successful bidder.   The Trustee has essentially ignored that potentially favorable

outcome to the estate and creditors, which would not be impacted whether or not the Connecticut Plaintiffs Judgment is sustained or reversed, in whole or in part.

39.     However, none of these issues have been resolved with the Joint Bidders inasmuch as they seek to own and destroy those brands and assets in their effort to ensure that Alex Jones has no platform from which he may employ his persona and talents to earn a living.  Accordingly, these bad faith motives permeate the entire bid structure that seeks to use the stayed, non-final Connecticut Judgment (as if legal consideration) for the purchase of these FSS assets when in fact they have no such legal status to do so.

40.     A sale to be acknowledge backup bidder, without all of the problems and complexities of the Trustee's proposed sale, is certainly in the best interests of the estate and all creditors, not just the Connecticut Plaintiffs.

## V.
## IRREPARABE HARM TO THE ESTATE OF ALEX JONES ALEX JONES PENDING INJUNCTIVE RELIEF

41.     Jones incorporated herein the statements and arguments referenced in §§ 1 through 39 above as if set out herein verbatim.

42.     In Texas, the execution on or turnover of assets of a judgment debtor to collect an *unstayed* Judgment on appeal, although the recognized manner to collect on such judgment, there is protection in the event that the judgment is reversed on appeal.  [*See, supra* Note 8.].  However, where a bankruptcy court has jurisdiction over a debtor's property, those assets can be ordered sold but not necessarily through a credit on a non-final judgment as a part of the purchase price, and not with the protections of the State of Texas if the execution sale were reversed on appeal.

43.     In this case FSS was not in bankruptcy when the Court ordered the sale of FSS's assets, and the Joint Bidders proposed purchase price of $7 million as a "gift" by the individual Connecticut Plaintiffs used to purchase the assets and based on a dollar-for-dollar consideration of

the *value of the stayed, non-final, Connecticut Judgment*.  This unique and inequitable results compels this Court to order that the protections of the Texas law on judgment sales will be applicable to any sale by this Court based on value attributable to the stayed, non-final Judgment.

44.     The harm, under these circumstances is irreparable simply because the individual Connecticut Plaintiffs, in their announced effort to force the sale FSS assets for the purpose of keeping Alex Jones from utilizing those assets to earn a living.  A Section 363 sale does not contain a similar provision that would allow Alex Jones to recover *entitled to recover from the judgment creditor the market value of the property sold at the time of the sale,* but this Bankruptcy Court may impose such relief which is sought in the pending Adversary Proceeding seeking injunctive relief.  Thus, if the joint and several judgments against Jones and FSS is reversed on appeal in any substantial amount Alex Jones may be relegated to collecting nothing, because the Connecticut Plaintiffs, are arranging this purchase in order to such down and destroy the value of the going concern of FSS, and can keep and select property (such as their splitting of the Onion's revenue for a period of time) while Jones and FSS have lost everything.   That "going concern value", so long as owned or participated by Alex Jones or Alex Jones and FSS, likely exceeds $30 million to $50 million, which will be lost with no remedy if this sale is not put in place.

45.     To further illustrate the power of federal courts to protect non-debtors and debtors alike, the opinion of *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 22, 107 S. Ct. 1519, 1532 (1987) deals precisely with the issues before this Court, and discounts Texaco's position from that of a bankruptcy Trustee and then from that of a Politically sensitive defendant (the NAACP).

> First, relevant to this Court's consideration, is the holding that "[w]hile 'a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard,' [citing *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971)]…." *Id. Pennzoil at* U.S. 22.[14]

---

[14]     "[I]n this case, Texaco clearly could exercise its right to appeal in order to protect its corporate interests even if it were forced to file for bankruptcy under Chapter 11. 11 U. S. C. § 362. Texaco, or its successor in interest, could

The Supreme Court, in discounting Texaco's right to receive a relief by an affordable appeal bond, the Supreme Court cited to several cases where special treatment was justified; "in the more troublesome situation where a particular corporate litigant has such special attributes as an organization that a trustee in bankruptcy, in its stead, could not effectively advance the organization's interests on an appeal" and, second, citing the Fifth Circuit opinion in

> *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979)
> (bankruptcy of NAACP would make state appellate review of First Amendment
> claims "so difficult" to obtain that federal injunction justified), cert. denied *sub
> nom. Claiborne Hardware Co.* v. *Henry*, 444 U.S. 1074 (1980).

The Supreme Court, in recognizing that the rights to foreclose on assets, although the subject of a state statute that required a cost bond that would bankrupt the NAACP, it found what most academics say was an obvious exception - focusing on the public confusion of a Mississippi group of white business owners (having been given a $3 million judgment against the NAACP for supporting a boycott of their businesses) executing on their judgment and taking over the name NAACP, and all its assets, and bankrupting the NAACP, held that "…[m]oreover, the underlying issues in this case -- arising out of a commercial contract dispute -- ***do not involve fundamental constitutional rights***." The exact same arguments are made here – the fundamental rights of Alex Jones as a media figure have been wholly and completely ignored. The fear expressed by the Supreme Court, illustrated by the Fifth Circuit opinion in *Henry* v. *First National Bank of Clarksdale* cited in *Texaco vs. Pennzoil*, was that the seizure of the assets and name of the NAACP, before the appeal was final, would so deprive the NAACP of constitutional rights and access to the ability to have those rights to protected, outweighed the mandate that in Mississippi only a

---

go forward with the appeal, and if it  [**1532]  did prevail on its appeal in Texas courts, the bankruptcy proceedings could be terminated.  § 1112. Texaco simply fails to show how the initiation of corporate reorganization activities would prevent it from obtaining meaningful appellate review.  *Pennzoil at* U.S. 22.

bond could stop the loss of these assets.  The comparisons are very similar.   A trial 28 miles from the Sandy Hook massacre is similar to a trial 45 years ago by all white businessmen against all black defendants and their organization the NAACP.   All the Supreme Court announced was the equitable exception that protection of fundamental constitutional rights take priority until the appeals are final.  The Supreme Court eventually heard the NAACP case and reversed.  Alex Jones believes that when his case reaches the Supreme Court, if it requires that level of appeal, his case will be reversed.

46.     The precise threat here is that not only is the Connecticut Judgment *already stayed until all first-round appeals are done*, but if the Connecticut Plaintiffs obtained execution on the judgment prematurely (*i.e.,* before the Judgment was final on appeal and unstayed) without protections under state law the Joint Bidders and each individual member, would be responsible to return the assets or the value of those assets to Jones.

47.     Alex Jones has filed an Adversary Proceeding seeking to enjoin this sale without protections for his property rights, personal rights and persona.  This remedy is justified under these circumstances.

## VI.
## FURTHER CONSTITUTIONAL OBSTICLES TO THE ALEX JONES DEBT

48.     Jones incorporates herein all of the arguments set out above, and in his Adversary Proceeding seeking injunctive relief prohibiting this sale, as well as his counterclaim against the Connecticut Plaintiffs based on constitutional grounds and deprivation of constitutional rights under 42 U.S.C. § 1983 (being transferred to this Court by stipulation of the parties from the District Court, WD-TX).[15]

---

[15]     Recently the Connecticut Plaintiffs filed in Travis County District Court (Austin, Texas) papers to domesticate in Texas the Connecticut Judgment which is currently on appeal in Connecticut.  They then filed state court actions for turnover and seeking a receiver, representing to the Texas State District Court that this Court had by "final order" found the actual damages award in the Connecticut Judgment were non-dischargeable.  The Jones Parties

49.     Jones alleges that the Connecticut Judgment should be reversed on appeal and clarifies to this Court those constitutional rights and remedies that the Connecticut Judgment ignored in rendering the death penalty sanctions of liability, then conducting a "death penalty" trial by excluding most all evidence of lack of damages as well as admitted hearsay and double hearsay from most every witness, make granting the injunctive relief, and preventing this needless "purchase and destroy" sale important to the bankruptcy system.

50.     First, under Connecticut law -- assuming that states' collateral estoppel law applies, as it should – the Connecticut Judgment cannot collaterally estop this Court as the Connecticut Judgment has not been subject to appellate review.  The Connecticut Supreme Court has held that "[a] party must receive one opportunity for appellate review before it will be subject to the application of collateral estoppel." *State v. Charlotte Hungerford Hosp*., 308 Conn. 140, 146, 60 A.3d 946, 950 (2013) *citing Commissioner of Motor Vehicles v. DeMilo & Co*., supra, 233 Conn. 268.  The Connecticut Plaintiffs surely know this requirement of Connecticut law and also know appellate review has not occurred.  Yet this Court was not advised of this and thus led into error in ruling that the Connecticut Judgment had collateral estoppel effect.

51.     Second, there are a host of United States Supreme Court mandates that apply when: (a) a media defendant, which Mr. Jones clearly is, is sued as he was in Connecticut; (b) the suit covers matters of public concern, which the Sandy Hook tragedy and ensuing national pushes for

---

removed these matters to the Western District of Texas and filed an answer, affirmative defenses and Counterclaims. *Erica Lafferty, et al Plaintiffs (Judgment Creditors) vs Alexander E. Jones, et al*, Civil Action No. 1:24-cv-1198 in the United States District Court Western District (Austin Division).  In addition, the Jones Parties filed a motion to transfer the venue of that case including the Counterclaims to this Court as this Court has the "first filed" case of related cases (i.e., the Discharge ability Adversary Proceeding[15]) making this Court the "Home" Court.  The Connecticut Plaintiffs have filed a motion to remand their collection case to state court but may have tentatively agreed to the venue transfer. In either event, the Jones Parties are quite confident that Fifth Circuit authority mandates that the venue issue be considered by the Western District of Texas before the remand and the venue transfer motion must be granted, transferring to this Court the Connecticut Plaintiffs' collection efforts and the Counterclaims asserted against them for violating Alex Jones's Constitutional rights.  *Concierge Auctions, L.L.C. v. ICB Props. of Mia., L.L.C.,* 2023 U.S. App. LEXIS 20513, at *3-4 (5th Cir. 2023).

gun control legislation clearly are; and (c) the Connecticut Plaintiffs have voluntarily thrust themselves into those public controversies and thus become public figures, which the Connecticut Plaintiffs surely did as almost immediately after the tragedy they began using the tragedy as a platform from which they publicly urged gun control legislation and endorsed and campaigned for gun control political candidates at every level of state and federal government.  In fact, Connecticut Plaintiff Erica Lafferty (now Erica Ash) gave an approximately five (5) minute speech at the 2016 Democratic National Convention introducing her friend Hillary Clinton whom she supported because of Secretary Clinton's positions on gun control.

52.     Third, as among the many ignored Constitutional mandates is that the Connecticut Plaintiffs were Constitutionally required to demonstrate by "***clear and convincing evidence*** that [Mr. Jones] acted with actual malice—that is, with knowledge that the published material was false or with reckless disregard of whether it was false." *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021) (emphasis added; internal citations; quotes omitted) (*citing New York Times Co. v. Sullivan*, 376 U. S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).  This Constitutional requirement effectively preempts any state law to the contrary and yet was tossed into the waste bin by the Connecticut state court's default judgment ruling.  Neither have they been presented to or considered by this Court.  All of these will be addressed in the soon-to-be-filed Jones Motion to Reconsider.

*Other Constitutional Federal Requirements Were Not Addressed*

53.     Binding federal authority, not presented to this Court on other issues include the established principal that this Court is fully empowered to review state court cases "…where state procedural law was inadequate to allow full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice" *Allen v. McCurry*, 449 U.S. 90, 100-03, 101 S. Ct. 411, 418-19 (1980).  The Jones Parties anticipate their Motion to Reconsider

will be filed by December 4, 2024.

54.    Likewise, the Supreme Court has clearly held that "deeply rooted in the common-law rule, predating the First Amendment, [is the requirement for] a ***showing of malice*** on the part of the defendant [by] plaintiffs to recover punitive or enhanced damages." *Herbert v. Lando*, 441 U.S. 153, 161-62, 99 S. Ct. 1635, 1641 (1979).  A showing of malice must, in turn, be made by "clear and convincing" evidence: "The Court has also determined that for … public figures, a showing of *New York Times* malice is subject to a clear and convincing standard of proof." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 15, 110 S. Ct. 2695, 2703-04 (1990).  Nothing close to this has been done and these and other points to be made in the Jones Motion to Reconsider doom any award of punitive damages and certainly doom the Connecticut Plaintiffs' efforts to avoid their discharge.

<u>*Asking the Jury to Deprive a Citizen of His Constitutional Rights*</u>

55.    Although always a consideration, it has become obvious that motivating this litigation is not the recovery of a monetary amount for an actual and legally recognized injury, or even allowing punitive damages reflecting any reasonable application of punitive or exemplary damages law or statutes, but is the political activism and political motive and goal to take The Alex Jones Show of the air and "out of the public discourse:"

> **"Berkowitz said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening.  Whether that means *walking away from public life*, to paying Sandy Hook families *in full* …."[16]**

> **Damages "should be awarded in an amount that assures Alex Jones is off any platform … taken out of this discourse …."[17]**

---

[16]    https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/

[17]    Video quotes from both *Texas Plaintiffs' closing arguments; statement*).  *See*, *YouTube* https://www.youtube.com/watch?v=xFaxgchQczg  "take Alex Jones platform … away … and make certain he cannot

56.     With the admissions of the nature of the bid that, based on a floating offer to topping bid instead of the highest and best bid of the competing bidders, it is now clear that this has always been litigation to quiet all future Alex Jones 1st Amended protected broadcasts because of his conservative leaning content and to silence his voice to his 50 million followers.  That Alex Jones is a threat to political ideology could not be better demonstrated by the statements of the buyer's bad faith motives for this purchase – to shut down and destroy the FSS business, and to use the IP to connect with Alex Jones customers through IP identifying internet communication to confuse, harass, and potentially threaten the thousands of customers of the FSS website and confuse the source of what the buyer touts as gun control ideology.   Although Motive is ordinarily irrelevant to the purchase of an asset at a legitimate auction, this is far from an ordinary judgment and far from an ordinary or legitimate auction.

57.     *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 15-17, 110 S. Ct. 2695, 2703-07 (1990) cast considerable doubt on the ability of these defamation damages to ever withstand judicial scrutiny:

> "In 1964, we decided in *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule…".

Jones is a clearly a media defendant, sued in Connecticut and Texas.  The Sandy Hook tragedy and ensuing national pushes for gun control legislation clearly are matters of matters of public concern that are at the heart of both suits.  The Connecticut Plaintiffs have voluntarily thrust themselves into those public controversies and thus become public figures, which the Connecticut Plaintiffs surely did as almost immediately after the tragedy they began using the tragedy as a platform from

rebuild the platform.  Take him Jones out of this discourse … that is punishment.  *See, also* Connecticut Plaintiffs opening statements both arguing that Alex Jones 1st Amendment rights must be silenced.

which they publicly urged gun control legislation and endorsed and campaigned for gun control political candidates at every level of state and federal government.  In fact, Connecticut Plaintiff Erica Lafferty (now Erica Ash) gave an approximately five (5) minute speech at the 2016 Democratic National Convention introducing her friend Hillary Clinton whom she supported because of Secretary Clinton's positions on gun control.  *See, also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 15-17, 110 S. Ct. 2695, 2703-07 (1990)

58.     There is no liability for a media defendant without proved showing of fault and fault cannot be presumed.[18]

59.     Finally, the death penalty sanctions were extreme and unconstitutional. Unconstitutional "death penalty" sanctions were heaped on Mr. Jones, specifically, among the penalties imposed, the Connecticut trial judge:

(a)     struck Mr. Jones's answer and all his constitutional defenses, making it procedurally as if Mr. Jones had simply not shown up;

(b)     *held Mr. Jones legally and factually liable for everything the Connecticut plaintiffs claimed in their pleadings*,[19] **_whether true or not_**, including actions and statements by unrelated third parties – all without plaintiffs having to offer any proof at all;

---

[18]     "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz v. Robert Welch,* 418 U.S. 323, 347, 94 S. Ct. 2997, 3010 (1974)

In other words, [in *Gertz*] the Court fashioned 'a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.'… the Court believed that this result was justified on the grounds that "placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 15-16, 110 S. Ct. 2695, 2704 (1990)

[19]     The Connecticut Complaint is not sufficiently specific.  First, the Complaint identifies no "express statements" that were allegedly made by Mr. Jones that are libelous.  In a traditional libel complaint, precise statements are quoted so that the court and parties can review and assess the words and context.  The Connecticut Complaint, although prolix, nowhere clearly highlights the precise allegedly libelous statements Mr. Jones was accused of making.

Second, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the libelous

---

(c)     judicially decreed that Mr. Jones had subjective knowledge of the falsity of everything the Connecticut plaintiffs claimed he and third parties said or did -- whether true or not -- without plaintiffs having to offer any proof at all;

(d)     judicially decreed that all that was left was a trial on plaintiffs' damages, which were presumed and which the Connecticut plaintiffs needed only to demonstrate by a preponderance of the evidence; and

(d)     ordered Mr. Jones to effectively remain silent during the damages trial, forbidding Mr. Jones from defending himself or challenging anything the plaintiffs said.

This placed an unconstitutional burden of proof Alex Jones that no person could overcome, much less a trial 28 miles from the most hideous crime upon children – with only Alex Jones left to blame after the death of the shooter, and his mother (the adult that armed him with death weapon).

---

"statement" and more importantly, why it was libelous. As one example of numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when he would move.  See e.g., Connecticut Complaint, ¶¶222; 230; 240; 259; 264.  Was this libelous?  Was it true?  The jury was told it was maliciously libelous without explanation.  Or another example is the repeated reference to one of the Connecticut Plaintiffs asking about cue cards while being interviewed on TV. See e.g., Connecticut Complaint, ¶¶ 102;  103; 105; 112; 113 ("ok, do I read off the card?"). Was this libelous?  Was it true?  It did not matter.  The jury was told it was maliciously libelous without explanation.

Finally, it is clear that the Connecticut Plaintiffs sought to hold Mr. Jones responsible for what independent third parties said and did.  In one example of many, the Connecticut Plaintiffs identified Defendant Wolfgang Halbig as an independent journalist and investigator who resides in Sorrento, Florida and who was the creator and operator of "the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com."  It also identified Defendant Cory T. Sklanka as a journalist who works with Halbig.  Connecticut Complaint, ¶¶ 36 & 37.  Although Halbig's name is used over 77 times in the Connecticut Compliant, other than a few references to Halbig's appearance as an occasional guest on Mr. Jones' show [Connecticut Complaint, ¶ 68] there are no allegations that would even remotely make Mr. Jones responsible for Halbig's statements and actions other than the completely unverified and conclusory allegation that "Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut."  Connecticut Complaint, ¶ 74.  The lone exception is the unverified, unsupported, conclusory and inaccurate statement that Halbig was "at all relevant times a servant, agent, apparent agent, employee, and/or joint ventures of the Jones defendants."  Connecticut Complaint, ¶87.  This lone, conclusory allegation is nothing but sheer conjecture and certainly nothing that overcomes Mr. Jones's first amendment rights. Yet the jury was told Mr. Jones was maliciously responsible for everything Halbig did.

Third, the Connecticut Complaint is replete with acts of third parties in allegedly stalking some of the Connecticut Plaintiffs.   Connecticut Complaint, ¶¶ 14; 15 ("They have confronted strange individuals videotaping them and their children."); 16; 55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.).  With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones, and the jury was told Mr. Jones was maliciously responsible for these acts.

60.     Jones only this day has received the opinion of the first Appellate Court of Connecticut reversing $150 million in CUPTA punitive damages liability claim arising from Jones' media status and his "product" (his speech) that the court was, itself, silent with regard to the defendants' products.

## VII.
## CONCLUSION

61.     This Court entered its order that had all the appearances of a normal bankruptcy auction.  The process was hijacked by the Joint Bidders zeal and dominance over the Trustee and this process.  The only other bidder (bidding *twice the amount of cash as the Joint Bidders*) played fully and completely by the rules, but who was deprived of any transparency especially of what bid conduct was being sanctioned by the Trustee, and the post-announced winning bidder conduct that makes no practical, much less legal sense, is the approved second bidder.  This Court should disqualify the Joint Bid and Joint Bidders for multiple reasons and enter an order awarding the sale to the backup bidder FUAC.   Doing so (i) does justice to this Court system that has been abused; (ii) resolves all of the collateral IP and Jones Personal claims, including copyrights and co-ownership; (iii) resolves all issues of the TBOC;  and  (iv) leaves the *status quo* as now in place in Texas, just as the stayed Connecticut judgment keeps those the status quo in place in Connecticut and ends what was destined to be endless litigation.

WHEREFORE, Alex E. Jones prays for the relief above requested and for such other and further relief as Alex E. Jones may be entitled, both at law and in equity.

Dated:  December 8, 2024

> */s/ Shelby A. Jordan*
> SHELBY A. JORDAN
> State Bar No. 11016700
> S.D. No. 2195
> ANTONIO ORTIZ
> State Bar No. 24074839

S.D. No. 1127322
**Jordan & Ortiz, P.C.**
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES**

Ben C Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served electronically to subscribers of the Court's electronic noticing system on December 8, 2024.

/s/ Shelby A. Jordan
Shelby A. Jordan